Peter GRASSIA, Plaintiff,

v.

Charles SCULLY, Superintendent of
Green Haven Correctional
Facility, Defendant.

No. 86 Civ. 3574 (KC).

United States District Court,
S.D. New York.

March 7, 1989.

As Corrected March 21, 1989.

Murray Singer, Legal Aid Soc., New York City, for plaintiff.

Gary Fidel, Asst. Dist. Atty., Kew Gardens, N.Y., for defendant.

OPINION AND ORDER *

CONBOY, District Judge:

This is a petition for a Writ of Habeas Corpus.

The prisoner, Peter Grassia, is now serving a sentence of 15 years to life upon his plea of guilty to participating in the arson

murder of two subway token booth clerks in New York City during the winter of 1979. His principal claim is that he entered his plea because his lawyer told him that a secret arrangement had been agreed to whereby he would be released from prison after serving only five years of his sentence. Accordingly, petitioner asserts that he was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel and that his plea was involuntary. For the reasons set forth below, the petition is denied.

I. BACKGROUND

A. The Crimes, the Arrests, and the Trial Court Proceedings

Shortly before 11 p.m. on the night of January 16, 1979 Officer William Baker of the New York City Police Department received a radio communication that an explosion had occurred at the Broad Channel subway station in the southeastern section of Queens.[1] When he arrived on the scene he observed smoke and fire coming from the subway platform, and a badly burned woman being held by a civilian.

This woman, and another also severely burned, were token clerks who were inside the token booth when it was sprayed with gasoline and ignited. The booth became engulfed in flames and was completely destroyed. The victims, Regina Reicheiter and Venezea Pendergast, died of their injuries after enduring a protracted period of intense and terrible suffering.

In the course of interviewing persons at the scene, Officer Baker learned that two or three boys and one girl were seen running from the station at the time of the explosion. Accompanied by two of these witnesses, Officer Baker left the station and went to the street. A short distance from the station, he observed a young girl who matched the description given to him, and one of the witnesses with him identified this girl, Linda Krauss, as one of the

---

* This is a corrected version of the Court's Opinion and Order dated March 7, 1989.

1. The statement of facts herein is derived from the transcript of the combined *Wade/Huntley* hearing conducted on June 20, 1979 in State Supreme Court, Queens County.

youths who had been seen fleeing the station at the time of the explosion. Ms. Krauss was subsequently placed under arrest by Officer Baker. After being advised of her rights, she made a statement implicating petitioner in the incident at the token booth.

Officer Baker then went to petitioner's home with other officers. After being invited into the house by petitioner's brother, these officers soon became convinced that petitioner was hiding in the attic. Petitioner was found and arrested for arson and attempted murder, and advised of his rights. The officers at the scene noted that at the time of his arrest, petitioner had a burn on his hand and singed hair. He was then taken to the 100th precinct.

Detective Donald Carroll told petitioner that he had just come from Peninsula General Hospital where the victims were being treated, that they were in grave condition, and that they would likely die. Asked if he wanted to talk about the incident, petitioner replied affirmatively. After again being advised of his rights, petitioner stated that earlier in the afternoon he had met William Prout who informed him that he, Prout, had received a summons for fare evasion at the subway station, and that the token booth clerk had turned him into the police; that Prout told him he wanted to get even with the clerk and asked petitioner to meet him at a gas station later that evening; that he met Prout at a gas station, that Prout left for a few minutes and then returned with a fire extinguisher; that the two then went to the subway station and Prout asked petitioner to be a lookout; that petitioner stood on the first landing and watched Prout approach the token booth; that Prout sprayed the booth with liquid from the fire extinguisher; that there was an explosion; that petitioner and Prout fled the scene; and that petitioner ran home.

About 2:00 a.m. Detective Frank Martinelli again advised petitioner of his rights, after which petitioner repeated in substance the aforementioned statement, but added that Prout had sprayed the liquid from the canister into the booth as well as on its exterior. Petitioner asserted that he was on a landing at some distance from the token booth when the booth ignited. Significantly, however, Detective Martinelli observed that petitioner had a burn on his left hand and that his hair and eyebrows were singed, thus corroborating the observation of the arresting officers.

At about 3:00 a.m. Assistant District Attorney Ryan arrived at the 100th precinct to interview petitioner, who, after again being advised of his rights, decided that he would rather have an attorney before speaking again. Accordingly, no further questioning was attempted.

Officer Baker then took petitioner to Central Booking where, after petitioner made a phone call and without a single question from Officer Baker, petitioner said that he was part of the fire bombing; that he was there when it happened, but that he did not spray the gasoline; that Prout had sprayed the gasoline; and that he (petitioner) was sorry that it had turned out the way it did.

Prout was found the following day hiding in a closet at 208 East 6th Road, Broad Channel, Queens, and arrested. On the way to the precinct, after being advised of his rights, Prout told Detective William Rochford that he and petitioner had bought gasoline in Howard Beach, and met Linda Krauss; that he and petitioner told Krauss what they were going to do and told her to meet them at the train station; that Prout sprayed the booth with gasoline; and that the booth exploded.

The appalling cruelty of the crime, combined with the fact that the three defendants were white teenagers and the two victims were middle aged black women, caused the case to attract immense and unremitting media attention, not only throughout the City, but across the nation.

On November 5, 1979, during the course of jury selection, petitioner and his co-defendant William Prout pleaded guilty before the Honorable Bernard Dubin to one count of murder in the second degree, in full satisfaction of two consolidated indictments containing two counts of intentional murder, two counts of depraved indifference murder, two counts of felony murder,

one count each of arson in the first and second degrees, one count of reckless endangerment in the first degree, and related assault counts. As will be elaborated upon below, the co-defendant Krauss had, on the first day of jury selection, pleaded guilty in open court, seriously implicating petitioner in the crimes charged. By his plea, petitioner admitted that under circumstances evincing a depraved indifference to human life, he caused the death of Venezea Pendergast, by spraying gasoline on her and in close proximity to her and in a manner which caused the gasoline to ignite. Petitioner acknowledged that he had consulted with his attorney and was entering the plea of his own free will without any threats or force. P 9.[2] In addition, he acknowledged that he had discussed with his attorney the nature of the crime that he was pleading to and that all the elements of the crime were fully explained to him. P 12–13. The only promise made to petitioner was that he would receive an indeterminate sentence of 15 years to life. P 9–10. The Court specifically asked petitioner, "Anyone made any other promises to you?", and he explicitly responded "no." P 10. The Court thereupon accepted petitioner's plea to one count of murder in the second degree, predicated upon a theory of depraved indifference to human life. P 14.

On January 8, 1980 petitioner came before Justice Dubin for sentence. Prout's counsel, Robert Sparrow, told the Judge in open court, in the presence of petitioner, that with respect to the agreed upon sentence of a minimum of 15 years "I recognize, your Honor, for both defendants, that *the Court's hands are tied by the statute* under which the plea was entered." (emphasis added) S 6.[3] The District Attorney, reflecting upon "the hatred that they (the defendants) had in their hearts, if they do have hearts," stated in open court, also in the presence of petitioner, that "our only consolation is that they (petitioner and

Prout) will be confined within prison walls and cells until they reach middle age." S 7. Justice Dubin specifically reminded both petitioner and Prout that "it will be middle age before you get out", and, significantly, that this was the understanding of their lawyers. S 9. Petitioner was seventeen years old at the time of his sentence.

## B. The State Post–Trial Proceedings

Two years and four months after sentence was imposed upon him, petitioner on May 7, 1982 moved, *pro se*, to vacate the judgment of conviction pursuant to New York Criminal Procedure Law § 440.10. He asserted, in substance, that his plea was obtained through the fraud and misrepresentation of his attorney, Anthony Sparacio, who was initially retained by petitioner and later appointed by the Court to continue his representation, in violation of petitioner's rights under the United States Constitution. Specifically, he claimed in an affidavit submitted with his motion that his guilty plea was induced by the "erroneous guarantee" of his attorney that he could be out on work release after serving five years of his fifteen years to life sentence. *See* Appendix to Petitioner's Memorandum of Law ("Pre–Hearing Memo") at 4–6. Additional affidavits of his mother Florence Grassia, his aunt Gloria Grassia, his sister-in-law Lisa Scanna, co-defendant William Prout, and Father Walter Mitchell, a Roman Catholic priest, were filed in support of the motion. *See id.*, at 10–29.

The District Attorney filed an affirmation dated June 7, 1982 in opposition to the motion, in which he asserted that it was the overwhelming amount of evidence against petitioner that persuaded him to plead guilty. Petitioner knew, the D.A. maintained, that if he went to trial he would be convicted, and would receive a minimum term ten years longer than the one he bargained for in the plea. *Id.* at 31. Attorney Sparacio submitted an affirmation

---

2. References preceded by "P" are to the stenographic record of the plea proceeding before Justice Dubin on November 5, 1979, contained in pages A1–17, Appendix, Respondent's Memorandum of Law, dated June, 1986.

3. References preceded by "S" are to the stenographic record of the sentence proceeding before Justice Dubin on January 8, 1980, contained in pages A18–27, Appendix, Respondent's Memorandum of Law, dated June, 1986.

dated January 19, 1983 in which he candidly conceded that he had given petitioner erroneous information to the effect that "he could start applying for a work release program as early as five (5) years and that he would have a good chance of achieving a work release program after ten (10) years if his prison record was a good one," but he emphasized that he told petitioner that "work release in connection with his case was not a matter of law, but a matter of discretion with the prison parole authorities." *Id.* at 33.

Justice Dubin denied petitioner's motion to vacate the judgment on January 31, 1983 without a hearing, finding no merit in his claims. *Id.* 35–37. Petitioner then appealed both the judgment of conviction and the denial of his § 440.10 motion. Now represented by counsel, petitioner again asserted that Attorney Sparacio's fraud and misrepresentation had induced his plea of guilty, thereby depriving him of his Sixth and Fourteenth Amendment rights to effective assistance of counsel.

On November 25, 1985 the Appellate Division of State Supreme Court affirmed petitioner's conviction and the order denying his § 440.10 motion. The Court concluded that "defendant's allegations of this alleged promise are flatly contradicted by his own testimony at the plea, at which time he stated that no promises had been made to him other than that his sentence was to be a prison term of 15 years to life." *Id.* at 41. The Court also rejected the claim that petitioner's "will was overborne by pressure exerted by his attorney", finding it "incredible that the strong feelings described could be so easily overwhelmed by his attorney's recommendation that he accept the offered plea," and observing that "in the intervening months between the plea and the sentence, no attempt was made by defendant or his family to withdraw the plea or dismiss the attorney because of his alleged duplicity." *Id.* at 41. Petitioner's application for leave to appeal to the New York Court of Appeals was denied on January 23, 1986. *Id.* at 43.

## C. The Federal Habeas Corpus Petition

Petitioner now seeks a Writ of Habeas Corpus in this Court. The late Honorable Edward Weinfeld referred the Petition to United States Magistrate Kathleen A. Roberts on May 9, 1986 for a Report and Recommendation. The Magistrate held an evidentiary hearing at Ossining Correctional Facility on May 13 and 14, 1987. On September 19, 1988 the Magistrate submitted her report to this Court, to whom the matter had been assigned after Judge Weinfeld's death. The Magistrate made certain findings and recommended that the Writ be granted. This Court ordered a supplemental evidentiary hearing, which was conducted before me on January 20, 1989. Having conducted a full, de novo review of the entire record, the Court declines to accept the Magistrate's findings and recommendations.

The petitioner summarizes his claims as follows: "my attorney induced me to plead guilty by a) misinforming me that I would be released from prison after serving only five years of my mandatory minimum sentence of 15 years, b) misinforming me that since my codefendant had accepted the prosecutor's plea offer, he could not testify in my defense, and c) falsely telling me that my family no longer supported my decision to stand trial. My attorney induced me to remain silent at sentencing, where I intended to seek to withdraw my guilty plea, by (a) falsely telling me that it was not possible for the court to vacate my guilty plea, and (b) threatening me with the loss of my early release on work release if I made known to the court his conduct which had induced my plea." [4]

Mr. Sparacio denies that he ever told petitioner that he would be released on work release after five years. He concedes that he erroneously told petitioner that he would be *eligible* for work release at some point between the fifth and fourteenth year of his term. [5] He categorically denies the

---

**4.** Petition at 5.

**5.** New York Correction Law § 851(2) defines a prison inmate eligible for a work release pro-

remaining four allegations in the petition. He emphatically rejects the principal charge, not mentioned in the petition and made for the first time in May of 1987 (on cross-examination in a Hearing before United States Magistrate Kathleen A. Roberts), that he told petitioner that the early release arrangement was a secret one, which had to be concealed from the press, the victim's families, and the court record. In a supplemental hearing in the District Court in January, 1989 Petitioner explicitly said for the first time that his lawyer had told him Justice Dubin was a participant in this secret arrangement. Mr. Sparacio denies this charge categorically.

1. The Hearing Before the Magistrate

*a) Petitioner's Testimony*

At the hearing conducted before Magistrate Roberts on May 13 and 14, 1987, Petitioner testified that he had been told by Mr. Sparacio on October 31, 1979, at the end of the first day of jury selection, that in exchange for a plea the judge had offered a sentence of 15 years to life, the minimum sentence for second degree murder, but that if he went to trial he would almost certainly be convicted and receive 25 years to life, the maximum sentence for murder. MT 391–93.[6] He also conceded that prior to entering the plea he had been comprehensively informed by his counsel of a substantial amount of damaging evidence that the District Attorney would introduce against him, including the statements he had made to the police; the medical examiner's report which would detail the gruesome injuries suffered by the victims, the testimony of Linda Krauss "that would implicate me" and evidence of his hair samples and hand injury. Furthermore, he said, he was aware of "several other things ... I can't remember, but there was quite a bit [of evidence]." MT 389–90. He also understood the significance of Linda

Krauss' having said in open court that he was the one carrying the gasoline. MT 518.

Petitioner testified that Mr. Sparacio felt very strongly that petitioner had virtually no chance of winning at trial, and that if convicted, would be sentenced to 25 years to life. Mr. Sparacio was anxious for petitioner to accept the plea, and upset that he wanted to go to trial. MT 393–97. Petitioner was also aware that "things were beginning to turn and look bad, you know. They never really looked good; but they were getting worse; and [Sparacio] was upset about the jury selection." MT 392. On Monday morning, November 5th, the day the trial was to begin, petitioner was told by Mr. Sparacio that Willie Prout, his co-defendant, had decided to plead guilty. MT 416. On cross-examination, petitioner conceded that he knew at the time of his plea that, as a result of the Huntley Hearing ruling, Prout, if he chose to testify on behalf of petitioner, could be cross-examined with the statements he had given to the police implicating petitioner. MT 503–04.

The fundamental issue in this case is what petitioner understood the judge's role in the early release "guarantee" to be, since Justice Dubin's remarks in open court about fifteen years and "middle age" clearly contradicted petitioner's asserted expectation. In the Magistrate's hearing, petitioner made the following statement, presumably to rationalize his asserted belief that the judge knew of the work release deal, thereby explaining petitioner's failure to raise it before the judge in open court:

Q [by ADA Bricker] Now, did anybody say anything during this discussion of work release about the judge and his connection with work release if any? Was anything said to you—let me before you answer, was anything said to you

gram as one "who is eligible * * * or who will become eligible for release on parole or conditional release within one year." Petitioner would thus not have been eligible for a work release program until he had served fourteen years of his fifteen year minimum sentence. *See* N.Y.Penal Law § 70.40(1)(a). New York Correction Law § 851(2) also states that no inmate convicted of a crime involving serious physical injury (including murder) may participate in a work release program at all, unless approved by the Commissioner of Correction.

**6.** References marked "MT" are to the stenographic transcript of the hearing before the Magistrate on May 13 and 14, 1987.

the judge has promised you work release in this case?

A The judge specifically, I was under the impression that he was aware of it, but I don't know where I got that information from. But, you know, that's—

THE COURT: Was it your understanding that the judge had anything at all to do with work release?

THE WITNESS: Specifically, your Honor, I remember the court, the chamber officers, a civilian in civilian clothing that was in the chambers that goes in and out of the chambers that the lawyers, I said, what's going on over there?

We are talking about the work release, and it was coming out of the chambers. But it wasn't—with the judge, I was under the impression that he was aware of it, but as far as coming from him, I don't know. I don't know. This is years ago.

Q Did your attorney ever represent that the judge is giving you work release or anything like that?

A At this time, not that I recall.

Q Did he ever say anything about the fact that it would be in the hands of authorities in the future rather than this judge, correction authorities?

A No.

Q You are sure of that?

A Relatively sure anyway. Trust my memory.

MT 486–487.

This exchange becomes critical in assessing the credibility of petitioner in connection with an additional charge made by petitioner at the conclusion of the Hearing before the Magistrate, and later, before me, to the effect that Mr. Sparacio told him that the judge was part of a conspiracy of silence to deliver the work release later while concealing it from the press and public at the court proceedings.

Petitioner also insisted that his co-defendant Willie Prout told him he expected "five years versus 25 years" as a result of his plea, based upon *his* conversations with *his* lawyer, Robert Sparrow. MT 490. To this Court's knowledge, Prout has never asserted such a claim in any court of law,

and Mr. Sparrow, a witness at the Magistrate's hearing, denied that either defendant was ever promised a five year release in his presence.

At the conclusion of the petitioner's cross-examination, there ensued a remarkable nineteen page direct colloquy between the Magistrate and the petitioner, notable for petitioner's spacious, rambling answers, the net effect of which was to add, in the closing minutes of a nine year, four court litigation, a wholly new charge against the beleaguered Mr. Sparacio, and other unidentified persons, implicitly including Justice Dubin, to the effect that the work release was a secret arrangement, to be kept from the press and the public, and that this is what induced petitioner to remain silent in the face of the Justice's comments about middle age.

After petitioner heard Justice Dubin say he wouldn't be out until middle age, what, the Magistrate asked, was Mr. Sparacio's response when petitioner asked about the inconsistency. We are told by petitioner that Mr. Sparacio responded, "a lot of things have to be said for the record." MT 529–31. "In the course of discussing what you would have to allocute to, the kinds of questions that would be asked, did your attorney or anyone else tell you not to mention the work release", the Magistrate further inquired, and the petitioner responded "I know that they says that something to the effect that God help us if the press at this point find out about it. I know that was a factor in it." MT 533. After some stumbling in response to the Magistrate's question as to whether he regarded the work release as a promise, in light of his record assertion that no other promises beyond the 15 year minimum had been made to him, he said first that he didn't know at the time of his plea if the work release was a promise, then he said he guessed it was a promise, then he said it was definitely a promise. MT 533–34. To persistent questioning from the Magistrate, he finally said "it tends to appear that it contradicts what I am saying here, and I understand what you are saying, your Honor. ... In my head, I knew I had

to get the plea accepted, and I had to be careful of the ears that were on my back as far as the press and the families ... at some point I said, you know, do people know about this? Is this going to get out? And they said, well, let's hope not. Let's hope to God the press don't get a hold of this." MT 534–35. The "they" referred to by petitioner was not further explored.

Regarding the other claims in his petition, the petitioner was examined at length during the Magistrate's hearing about his feelings toward and relationship with Mr. Sparacio. The day after taking his plea, he met with his family and, he asserted, he discovered that they had never abandoned support for him to go to trial. He immediately concluded that Mr. Sparacio was a liar, and became very angry toward him. He decided then and there to withdraw the plea. He was "going to bring it to the judge". MT 418–19, 424. Petitioner testified that he did not want to speak to Mr. Sparacio and never wanted to see him again. MT 547. Yet during this period he forwarded letters to Mr. Sparacio in support of the pre-sentence memorandum the lawyer was preparing. MT 520–21. During the two month period between entry of the plea and sentence, he did nothing to confront Mr. Sparacio, in person, by telephone or by letter. Nor did he seek to contact the judge. Nor did he bring up the matter with his close friend and confidant, Prison Chaplain Father Walter Mitchell, as will be demonstrated below.

On the date of sentence, he claims that he did confront his lawyer, called him a liar, and announced his intention to withdraw the plea. According to petitioner, Mr. Sparacio explained to him that

"it would do no good because the judge could not return the plea, could not give me back my plea, could not reverse the so to speak confession as he said that I made when I took my plea, and he couldn't reverse that situation and he would have to continue the way it was and that if I made a mockery of him, he wouldn't work for my release in five years, in other words.... In essence he was saying if I made a mockery in the courtroom of him, he wouldn't work for my release, and it actually would hurt my chances for work release, and I would still be sentenced, a saying I never understood, like the judge would withdraw my sentence and give me 25 to life. I never understood that. I understood it would hurt my chances for work release if I mentioned anything and that he would withdraw. It served no purpose if I mentioned anything in the courtroom about his earlier actions.... I wanted to tell the judge about it; and he convinced me otherwise."

MT 425–27.

### b) Father Mitchell's Testimony

Father Walter Mitchell, a Catholic Chaplain at the Brooklyn House of Detention at the time petitioner was incarcerated there, and a close and regular confidant of petitioner at the time, testified that during the weekend prior to petitioner's acceptance of the plea on Monday, November 5th, petitioner's mother did not, in fact, support his determination to stand trial. MT 18, 52–54. Advice to plead guilty was coming from his mother. MT 54, 88. Indeed, petitioner was sensing pressure from his family to plead. MT 20, 35, 37, 53–55. Father Mitchell did not recall petitioner ever telling him that Mr. Sparacio had lied about petitioner's family's position with regard to the plea of guilty. MT 92. He also did not recall any discussions relating to petitioner's allegation that he had asked his attorney to withdraw the plea, but that Mr. Sparacio refused to do so or told him it wasn't possible. MT 92. Finally, Father Mitchell did not have any particular recollection regarding petitioner's claim that his attorney advised him not to bring up the issue of work release in front of the judge. MT 92–93. On the Sunday following the plea, Father Mitchell, who had closely counseled petitioner for months, saw before him "a kid who was emotionally upset", but saw or heard no expression of anger against his attorney. MT 50–51.

Father Mitchell, who was called by petitioner, testified that after speaking by telephone with Mr. Sparacio on the weekend prior to the entry of the plea, and being

assured that work release would be available to petitioner after "five to seven years," he urged petitioner to accept the plea. MT 23, 37, 52. On cross-examination, Father Mitchell testified that Mr. Sparacio had said in this telephone conversation, regarding work release, that petitioner "would be *eligible* for it *after a period of time*" [five or seven years], and that there was *"nothing guaranteed."* MT 44 (emphasis added). Father Mitchell indicated, however, that when he left the Brooklyn House of Detention the weekend before the Monday plea, petitioner was not interested in the work release program, was focusing instead on his chances of winning at trial, and, in substance, rejected his advice to accept a plea based upon the work release program. MT 24, 71.

During the two month period between the plea and sentence, Father Mitchell visited petitioner twice at Rikers Island, and he could remember no anger or distrust voiced against his attorney by petitioner, MT 57, nor could he remember any talk about petitioner being determined to withdraw or even considering withdrawing his plea. During this two month period, Father Mitchell had numerous conversations with petitioner's family members, and he testified that he heard no negative comment from them about Mr. Sparacio, MT 61, and nothing to the effect that the family had been betrayed or lied to by him. MT 62.

With respect to petitioner's understanding of the strength of the case against him, Father Mitchell testified that petitioner reported to him that Linda Krauss was to be "brought in as a major witness against Peter and William both, that she would state that (sic) the details of the incident and place both Willie and Peter in a position of doing—of murdering, of ignoring the danger to human life in an incident and doing so deliberately," MT 72, and that petitioner was, according to Linda Krauss, an accomplice, and that she would testify that, acting together, "Willie and Pete did the act that caused the death of the two women." MT 77. Petitioner also understood that she would testify that the fire was started with a match. MT 78.

### c) Florence Grassia's Testimony

Petitioner's mother, Florence Grassia, insisted that on the Saturday prior to acceptance of the plea, in the presence of Father Mitchell, she unequivocally supported her son's decision to go to trial and did not urge him to plead guilty. MT 108–09, 197, 199. This testimony is, as already indicated, flatly contradicted by Father Mitchell. She also asserted that she asked Mr. Sparacio if she could have a "receipt" for the judge's promise of work release. MT 113. She essentially supported her son's position in asserting that Mr. Sparacio's secretary had physically prevented her from entering the courtroom on the day of the plea, MT 118–19, 156 and complained that she and her son had been lied to by Mr. Sparacio. MT 125. She acknowledged, however, that her son never told her Mr. Sparacio had told him that she and her family were in favor of him taking the plea. MT 202.

### d) Anthony Sparacio's Testimony

Anthony Sparacio testified that he told petitioner that Linda Krauss' testimony would hurt his case, MT 257, and that from the time the judge offered the fifteen years, he felt that going to trial was a "big mistake". MT 345. He was very concerned that petitioner would lose the case and receive twenty-five years to life. MT 266, 362–63. When given his counsel's advice to accept the judge's offer, petitioner "wanted time to think it over. He was still in the view of sticking with going to trial, but he said he would consider it and he wanted to talk to Prout." MT 266. Mr. Sparacio said that he and Prout's attorney, Robert Sparrow, told their clients that because of their youth, and if they were model prisoners, they would "have a chance at work release," MT 269, but it would be discretionary, MT 270, and that "when you get 15 to life, you have to do the 15". MT 359. Mr. Sparacio agreed that the possibility of work release was a factor in petitioner's decision to plead guilty, but it was not the important factor. MT 358.

Mr. Sparacio insisted that he told Father Mitchell in the weekend telephone call prior to the entry of the plea that "if there is a possibility of work release it is discretionary with the Department of Corrections. The judge does not give work release ... when you get 15 to life, you have to serve the 15." MT 267. He flatly denied ever telling petitioner, his mother, or the priest that petitioner could get out on work release in five years. MT 337. On the question of Prout's availability as a witness for petitioner at trial, Mr. Sparacio recalled urging petitioner to abandon the idea of calling Prout as a witness because if petitioner did not plead guilty the prosecution would undoubtedly require Prout to give an allocution incriminating petitioner and that Prout's testimony would therefore be detrimental to petitioner's case. MT 344–47, 369–70, 377. He did not believe Prout's testimony could exculpate petitioner, because of Prout's statements to the police "plus other investigations of mine." MT 239. He did not "think it would be good for Peter for him (Prout) to testify." MT 241. Indeed, Prout's lawyer told him that Prout was *not* going to testify favorably for petitioner. MT 377. When petitioner learned that Prout was going to plead guilty, he became upset, and wanted to talk to Prout. MT 345.

Mr. Sparacio told petitioner that he would almost surely be convicted if he went to trial, and that, if convicted, he would almost certainly receive twenty-five years to life. MT 349. He denied telling petitioner that his family no longer supported his decision to go to trial. MT 350–51. On the date of sentence, the petitioner did ask Mr. Sparacio what would happen if he took back his plea, and Mr. Sparacio said that if he went to trial and was convicted, the judge would undoubtedly give him twenty-five years. MT 291, 294, 354. He flatly denied telling petitioner that the Court could not give him his plea back, MT 354, and that he would not be able to get work release if he spoke to the judge about withdrawing his plea. MT 355, 357. He stated that no one in petitioner's family expressed any reservations to him about the sentencing, MT 295, and he denied ever telling the family that petitioner could not withdraw his plea. MT 355.

With respect to the strength of the case against petitioner, Mr. Sparacio arranged to have an investigator retained to uncover and develop evidence possibly favorable to the defendants. Upon completing his work, Investigator Roger Horan prepared a formal report, advising that nothing beneficial had been found, and petitioner was so advised by his counsel. MT. 244. Furthermore, no witnesses had been located who could testify favorably on petitioner's behalf, and petitioner was so informed. MT 247.

During the pre-trial period, Mr. Sparacio met with petitioner "15 or 16 times" in jail to prepare for the trial. MT. 249. He told petitioner that the substance of Ms. Krauss' statements "would hurt him." MT 255.

After the plea offer was made, and prior to the weekend of November 3–4, Mr. Sparacio told petitioner "that he should seriously consider taking the offer because between the weight of the evidence, the possibility of Linda Krauss testifying, the public reaction against it and the attitude of the jurors during voir dire that I was concerned that he would lose the trial and if convicted receive 25 years to life. I was very concerned for him at that point." MT 266.

According to Mr. Sparacio, petitioner was given a comprehensive and damning account of the overwhelming evidence the District Attorney was prepared to introduce against him:

"THE COURT: And during those discussions, did you review with Mr. Grassia what you understood to be the evidence that would be presented against him in court?

THE WITNESS [Mr. Sparacio]: Yes.

THE COURT: Could you tell us as best you can recall what were the elements of that evidence that you considered to be so strong and perhaps even overwhelming that you were strongly recommending the acceptance of the plea?

THE WITNESS: Yes, ma'am. I went over this Huntley hearing. I still have the record, and as the record was, the admissions that were not disallowed by the judge—

THE COURT: So one factor that you reviewed with Mr. Grassia was his own post-arrest statements—

THE WITNESS: Yes.

THE COURT: —that would presumably come into evidence?

THE WITNESS: Because they were not suppressed.

THE COURT: Was there anything else that came out at the Huntley hearing that you considered to be damaging to Mr. Grassia's case and that you discussed with him as part of the People's case?

THE WITNESS: Well, as far as I can remember, I think just his statements were the things I was concerned about in this respect.

THE COURT: What else did you discuss with him in terms of the weight of the evidence against him?

THE WITNESS: I discussed the fact that co-defendant Linda Krauss had taken a plea, and her lawyer indicated to me that she had made some statements that could possibly be used against him.

I also indicated to him that I did an investigation of the area, of witnesses, the family and became very well acquainted with the case having put in over 250 hours of work both in court and outside of court and in my office; and from visiting the scene and talking with the people, I learned a lot about this case. I thought that my experience from all of these things told me that it didn't look good.

It was very difficult voir diring the jurors that day because many of them even ten months later said that they had preconceived notions. And I was afraid that the ones that said they didn't have preconceived notions might not have been telling exactly as it was in their minds. So between the publicity, the jurors, Linda Krauss, my own investigation, the Huntley hearing, the brief investigation of Robert Horan that was ordered by the court on their behalf, an 18B investigation, I thought that the likelihood of a conviction on those matters, on those facts would be imminent and that if he did get a conviction, I was concerned about him getting 25 years knowing—the 25 years was bad enough, but then he would know that he had had the 15 years and having to go through the ordeal of a trial and then do ten more years I thought would have been very unfair to this young man.

THE COURT: Well, specifically with respect to what you thought the government or the People were going to present by way of evidence, what information did you have and communicate to Mr. Grassia about the strength of the government's case, of the People's case?

THE WITNESS: I told him they had a very strong case.

THE COURT: And what was the case? Were you aware of particular witnesses who were going to testify against Mr. Grassia?

THE WITNESS: They were going to bring in, besides the detectives and the enforcement agents that took these statements, they were going to bring in the medical reports and describe how these women burned to death; and I thought that that would be very inflammatory because they—we would object naturally, but they were going to describe the mode of death; and I thought a jury hearing that would be most uncomfortable with that situation.

THE COURT: And that was in connection with the depraved indifference aspect of the charges?

THE WITNESS: Yes. The district attorney said they were going to do those things. He told us on an informal basis in the judge's chambers and outside. So that very much concerned me.

THE COURT: Did you discuss that with Mr. Grassia?

THE WITNESS: Yes. I told him at length what happened. He was very concerned what happened in the begin-

ning because the alleged incident did not produce death instantly.

It took four or five days for these people to slowly die in a hospital both of internal burns, I understand they inhaled flames, and external burns. So that kind of description was not going to go very well at a trial in front of a jury.

I also told him that Linda Krauss had made some statements during her allocution and her plea and had also given statements to the district attorney in exchange for some sort of a lenient sentence and that she would not likely be brought in also. She was one of the original co-defendants in the case.

THE COURT: Yes.

THE WITNESS: And that her allocution and her statements, the district attorney would not have given her the plea he gave her unless he was satisfied that they would inculpate other people; and I also told him how the jury selection was going and how concerned I was for him because of that.

I also told him how many times I visited with family, friends, the witnesses I interviewed, the scene; and I told him that the investigator went around and took some statements and tried to do as best he could and that it just didn't look good.

THE COURT: Apart from Ms. Krauss' testimony, were there other witnesses who placed Mr. Grassia at the scene of this incident?

THE WITNESS: Co-defendant Krauss and the statements. There was somebody, we have a statement from somebody who saw two boys run away. I don't know how much—how he could have—I never got to interview him.

THE COURT: Well, there was some testimony at the Huntley hearing as I recall about Mr. Grassia's name having been given to the original investigating officers.

Did you have any knowledge of that?

THE WITNESS: The name was given by Linda Krauss. I read that, yes.

THE COURT: That was Ms. Krauss, not somebody else to your knowledge?

THE WITNESS: Yes. That's in here. That's why the officers went to his house. That's in the Huntley hearing. That's all I am quoting.

THE COURT: Now, I gather there was some sort of fire marshal report in this case?

THE WITNESS: Yes, I think there was a fire marshal report.

THE COURT: You stated in the presentence memorandum that the fire marshal's report does not disclose any thrown match or cigarette or any other evidence of intentional conduct, et cetera?

THE WITNESS: Yes.

THE COURT: And did you consider that to be something favorable to Mr. Grassia?

THE WITNESS: Yes.

THE COURT: Was it your understanding that the People would be required to prove that the defendants had actually thrown a match or a cigarette or something like that?

THE WITNESS: No. They didn't have —no. That was just part of my—it would have been part of my strategy to show no intent.

THE COURT: And did you discuss with Mr. Grassia the fact that it was not necessary for the People to actually prove that a match had been thrown?

THE WITNESS: I discussed spontaneous combustion and the things that could have happened.

THE COURT: The foreseeability of that under the circumstances?

THE WITNESS: Yes, I did, your Honor.

THE COURT: Did you discuss with Mr. Grassia the concept that he could be found guilty of murder, even if he had not actually intended for these women to die, just because of the circumstances of the use of the gasoline, et cetera?

THE WITNESS: Yes.

THE COURT: You discussed that?

THE WITNESS: I did."

MT 361–67.

Mr. Sparacio took great care, during the hearing before the Magistrate, to say noth-

ing that would breach his confidentiality obligation to petitioner. On numerous occasions, the Magistrate and counsel conducting the proceeding gave indication of sensitivity to the difficult professional position in which Mr. Sparacio found himself. Nonetheless, the point was made that Mr. Sparacio, early in the litigation, filed an affidavit in which he made no specific denials of certain allegations made against him by petitioner. Mr. Sparacio responded as follows:

Q [by ADA Fidel] Now, Mr. Singer asked you if you in fact replied to certain allegations that were made by Mr. Grassia. There are about three or four of them in your affirmation, and you replied that you had not.

Was that in any way on your part meant to be an admission that those allegations were true?

MR. SINGER: Objection, your Honor, to the form of the question. He is leading the witness.

THE COURT: No. Overruled.

A No. I was concerned about writing anything more in that affidavit that might hurt Peter, and my concern was when I first came in here and your Honor described to us the parameter within which we may speak.

And I didn't want to hurt him by saying anything in that affidavit, not that there is anything that can hurt him; but if anything could hurt Peter, if I had to explain things in detail, until I knew the parameters, I did not want to disclose anything more than I had to without disclosing anything of our private conversations.

And I have stuck to that today, too. MT 372–73.

### e) Robert Sparrow's Testimony

Robert Sparrow, counsel to co-defendant William Prout, testified before the Magistrate and stated that Linda Krauss pleaded guilty in open court to attempted manslaughter in the first degree, on the first day of jury selection on October 31, 1979 in the presence of petitioner and Prout. Based upon his notes, Mr. Sparrow testified that during her plea allocution Krauss stated that she met Prout and petitioner on the night of January 16, 1979, that Prout and petitioner had a fire extinguisher containing gasoline, and that they told her they were going to spray it in the token booth. She stated that petitioner, while carrying the fire extinguisher, had accidentally pressed down on the lever of it causing the gasoline to leak, and that petitioner was present when she provided Prout with matches. MT. 311–12. She also stated that she saw petitioner and Prout running from the scene after the explosion and identified both defendants in court during her allocution. MT 312. Mr. Sparrow testified that he discussed the seriousness of Krauss's allegations in group conversations with petitioner, Prout, and Sparacio. MT 313. It was apparent from the District Attorney's statement that Krauss had agreed to be a witness for the prosecution against them. MT 312.

Shortly thereafter, Mr. Sparrow testified, he, Mr. Sparacio and petitioner and Prout met as a group to discuss the plea offer of 15 years to life.

I do specifically remember talking with them jointly about the fact that were they to receive a sentence of 15 years to life, the two young men, who were then approximately 16 or 17 and 18 years old respectively, could look forward to getting back out into society when they would be 30 or in their early 30s as opposed to the probability were they to go to trial and be convicted of not being out until they were in their 40s, which *we all agreed would be a very, very significant difference*. Instead of being relatively young men who would have most of their lives to still look forward to, they would be into perhaps middle age, and those extra ten years would be very, very significant.

I think at that point it was a combination of these factors that I just mentioned, the pressure of the evidence as it had been made apparent to us, the pressure of the one witness turning, this girl Linda, the pressure of the threat of a likely

25 year sentence *is what impelled the plea more than anything else.*

MT 305–306 (emphasis added).

In more general terms, Mr. Sparrow was asked to describe petitioner's state of mind during the joint plea discussions.

THE COURT: Now, based on your discussions with Mr. Sparacio, can you tell me whether or not you understood that during the course of these plea discussions that Mr. Grassia was resisting taking a plea or generally going along with it?

Do you have any recollection at all of anything you learned either from discussions, the joint discussions or from Mr. Sparacio about the sort of state of mind of Mr. Grassia in terms of accepting or rejecting the 15 to life plea offer?

THE WITNESS: Nothing specific except for the fact that nobody likes to plead guilty to a crime, certainly nobody likes to plead guilty to a crime such as this with a sentence such as 15 to life, and it wasn't a proposal that was immediately accepted.

There were discussions, both individually and jointly, which ultimately, as I say, based *on the likelihood of conviction led to the plea.*

MT 323–24 (emphasis added).

### 2. Hearing Before This Court

In light of the foregoing, and in view of the fact that Mr. Sparacio was not recalled and given an opportunity to respond to the new charge of official conspiracy to conceal the work release bargain from the press, the public, and the formal record of the New York State Court system, this Court on January 9, 1989 ordered a supplemental evidentiary hearing on the matter, to be conducted before me on January 20, 1989.

At that hearing, petitioner elaborated on the conspiracy of silence. "We wouldn't want the press to get a hold of something like this should we go ahead with this arrangement. It should be done pretty quiet. We would sneak in and sneak out

... it would be just like an undercover thing, you know, just like off the record—I don't know if off the record is the right word—it just wouldn't be brought up because we didn't want the families to know." Tr 11.[7]

Petitioner's mother wanted to know why the judge wouldn't put something in writing about the work release, according to petitioner, and Mr. Sparacio said "God forbit (sic), or something to that effect, should the press become aware of this deal," Tr 13, which deal involved, according to petitioner, not mere eligibility for release in five years, but actual release in five years. Tr 13. Petitioner states that he was told by Mr. Sparacio that the judge was a party to the deal for a five year release. Tr 14–15. Petitioner was asked, after hearing the judge and the lawyers at the sentencing make reference to the fact that the defendants would not be released until they reached middle-age, "why you didn't say to the court, But, your Honor, I'm going to be out earlier on work release?" Tr 37. He responded that "it was clearly understood that I shouldn't speak about work release in the courtroom openly or public. It was restricted to myself and my family and so on, that immediate group, the lawyers." Tr 37. "This was something private, and we were supposed to do this, I was going to do it quietly and I was to disappear, and five years later everyone forgets about me and I am coming out." Tr 42. According to petitioner, the judge made the remark about middle age just to make the record look "good." Tr 48.

Mr. Sparacio testified that both he and Mr. Sparrow told petitioner that "this judge that sentences you has nothing to do with work release ... the parole board later on decides these things, so no matter what you did in court now has nothing to do with work release." Tr 80. Asked if he at any time said to Mr. Grassia or represented to him that this provision of work release had to be kept secret, Mr. Sparacio stated:

---

**7.** References marked "Tr" are to the stenographic record of the supplementary hearing before the District Court on January 20, 1989.

A. No. In fact, I have to say something. I received letters from Mr. Grassia from jail, I received petitions and affidavits to which I had to answer, and I also testified before the magistrate at the correctional facility. The first time I heard the word "secret" was today. This was never brought up to me. It was never asked of me in papers, it was never asked of me by the magistrate, by yourself, nor by the attorney for Mr. Grassia, as the record will bear out. This is the first day I have heard the word "secret" provisions for work release.

Q. Well, did you ever advise Mr. Grassia that the work release provision had to be kept from the press?

A. No, I did not.

Q. Did you ever tell him that he should strictly avoid bringing this subject up at any time in open court?

A. No, I did not. I told him that work release did not pertain to this court, it pertained to the parole board.

Tr 81.

Mr. Sparacio was asked what he told Mr. Grassia as far as what he should do or say in the courtroom during the sentencing. "I told him to listen to the judge, and if he had any questions, to ask me or ask the judge." Tr. 83. Regarding the defendant's reaction to the judge's comment about middle age, Mr. Sparacio testified as follows:

Q. Now, there came a time during the sentencing when the court, when the prosecutor made some remarks and then the court made some remarks about how the two defendants, at the time Prout and Mr. Grassia, would not be getting out until they were middle-aged, do you recall that?

A. Yes.

Q. At the sentencing itself, did Mr. Grassia say anything to you about that comment?

A. He talked in my ear and said, What is this about middle-age? I said, you are only getting 15 years, 31 is not middle-aged. If you were getting 25, you would be getting out at 41. I told him 15 and 16 is 31, you are not getting out in middle-age.

Q. Did you at any time advise Mr. Grassia that the judge in the case was going to be saying certain things on the record which were there just for the benefit of the victims' families and the press which you should not pay any attention to?

A. No.

Tr 83.

\*     \*     \*     \*     \*     \*

Q. You have indicated that at the time sentence was imposed, the court made a remark concerning that Peter would not be out until he was middle-aged, correct?

A. The judge said something of that nature. The exact words I don't remember.

Q. And it is your testimony today that immediately after the sentence, sentence was imposed and the judge made these remarks, that Peter asked you something about what did he mean by that or what was that statement all about?

A. Yes.

Q. Peter did raise the issue?

A. He asked me some kind of question while we were standing there. "I thought I'm getting out earlier."

Q. And what was your response?

A. My response was, You are getting out at 31. He was 16, that's not middle-age. I said, Don't worry, you are not going to stay in until you are 41. I think he was concerned with the fact that he thought he was going to get 25 years, because I explained to him later when I saw him that I would think middle-age is 40 to 60, not 31 years old. So I told him, Don't worry, you are getting out when you are 31, not later.

Q. But Peter did raise the issue of what the court meant by that?

A. Yes. He was—he heard middle-age and he thought he would be an old man.

Q. And you indicated, in essence, not to worry about it?

A. That 31 is not middle-age.

Q. That the sentence he got was basically what you explained?

A. Right.

Tr 100–01.

Mr. Sparacio also insisted that he never told Mr. Grassia that he could not by law withdraw his plea, or that if he tried to withdraw his plea than the whole work release deal would be off. Tr 85.

## II. LEGAL ANALYSIS

In *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), the Supreme Court considered the issue of the voluntariness of a guilty plea in the context of a claim of ineffective assistance of counsel. The alleged ineffectiveness of the petitioner's counsel in that case arose out of the attorney's erroneous advice to the petitioner regarding the time he would have to serve under a plea bargain before becoming eligible for parole. According to Hill, his attorney had informed him that if he pleaded guilty he would have to serve one-third of his prison sentence before being considered for parole. Because Hill had a prior conviction in another state, however, he was considered a second offender under Arkansas law and was thus required to serve one-half of his sentence before becoming eligible for parole. Since he had entered his plea upon the mistaken belief that he would be eligible for parole after serving one-third of his sentence, Hill argued that his plea was not voluntarily entered.

The *Hill* Court held that the two-part standard for evaluating claims of ineffective assistance of counsel adopted in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies to guilty pleas. *See Hill,* 474 U.S. at 57, 106 S.Ct. at 369. To satisfy the *Strickland* test, a habeas petitioner must demonstrate: (1) that his counsel's challenged acts or omissions made counsel's overall performance fall "below an objective standard of reasonableness," *id.* (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064); and (2) "a reasonable probability that, but for counsel's errors, he * * * would have insisted on going to trial." *Id.* 474 U.S. at 59, 106 S.Ct. at 370. The second, or "prejudice," requirement "focus-

es on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* In *Hill,* the Court found that the petitioner's allegations were insufficient to satisfy the second requirement because petitioner did not allege that, had counsel correctly informed him about his parole eligibility, he would have pleaded not guilty and insisted on going to trial. *Id.* at 60, 106 S.Ct. at 371. Without such an allegation, the Court held that the second part of the *Strickland* test had not been met and therefore that the trial court properly dismissed the petition without an evidentiary hearing. *Id.* The Court found it "unnecessary to determine whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective assistance of counsel." *Id.*

Although petitioner here has properly alleged prejudice, I find the claim to be without merit as discussed below. Therefore, I need not address the question of whether his counsel's advice on work release fell below an objective standard of reasonableness. As Justice O'Connor noted in *Strickland, supra,* 466 U.S. at 697, 104 S.Ct. at 2069, "(i)f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

Under the second prong of the *Strickland* test, petitioner must demonstrate a reasonable probability that, "but for" counsel's errors, he would have insisted on going to trial. *See Hill,* 474 U.S. at 57–58, 106 S.Ct. at 369–370. The Supreme Court has emphasized, however, that "(i)t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test ... and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding," *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067 (citations omitted). It is necessary to show prejudice, and the burden is upon the petitioner to affirma-

tively demonstrate it. *Id.*, at 693, 104 S.Ct. at 2067.

Two cases in our own Circuit have undertaken the *Strickland*-type prejudice analysis in the face of habeas corpus petitions that attacked convictions obtained by plea as distinguished from trial verdicts. In both cases, the complaint of ineffective assistance of counsel focused upon the asserted failure of lawyers to inform their clients of the availability of affirmative defenses at the time of entry of pleas of guilty. In *Mitchell v. Scully*, 746 F.2d 951, 955 (2d Cir.1984), *cert. denied*, 470 U.S. 1056, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985), the Court reviewed the strength of the prosecutor's case against the petitioner, and concluded that there was no reasonable probability that advising Mitchell of the existence of an affirmative defense would have produced a result more favorable to him than the plea bargain he received.

In *Ames v. New York State Division of Parole*, 772 F.2d 13 (2d Cir.1985), *cert. denied*, 475 U.S. 1066, 106 S.Ct. 1379, 89 L.Ed.2d 605 (1986), a petitioner who had pleaded guilty to ten counts of robbery in seven indictments claimed that he would not have pleaded guilty if he had been properly advised of the availability of an affirmative defense. The Court undertook a careful analysis of the defendant's sentence exposure upon the assumptions that he had gone to trial, that the affirmative defense had succeeded, and that he had been convicted of lesser grades of robbery based upon his "imitation pistol defense." The court stated "[w]e see no reason to assume that Ames would have received concurrent sentences following conviction for ten separate robberies. In short, Ames has failed to show a reasonable probability that, but for his attorney, the ten counts of robbery would have been disposed of on a more favorable basis than they were." *Id.* at 16. In these cases, the Circuit Court of Appeals reiterated in plea cases what it had consistently said in non-plea ineffectiveness of counsel cases: the strength of the prosecution's case is critical in assessing "reasonable probability" under *Strickland, see Tsirizotakis v. LeFevre*, 736 F.2d 57, 63–65 (2d Cir.1984), *cert. denied*, 469 U.S. 869, 105 S.Ct. 216, 83 L.Ed.2d 146 (1984), and that where such evidence is found to be overwhelming, the error of counsel notwithstanding, there is no "reasonable probability" under *Strickland, see Wise v. Smith*, 735 F.2d 735, 739 (2d Cir.1984).

Although it does not discuss the *Strickland* factors, another habeas case in our Circuit involving an attack on a conviction by plea is highly relevant. *See Renzi v. Warden, U.S. Penitentiary*, 792 F.2d 311 (2d Cir.1986). In *Renzi*, the petitioner claimed that his plea was involuntary in that defense counsel did not fully and adequately advise him as to all of his rights, such as the right to confrontation and the right against self-incrimination, or all of the elements of second degree murder, the crime to which he pleaded. *See id.* at 312–13. The circuit court affirmed the district court's dismissal of the petition, finding that the guilty plea was, in fact, valid. *See id.* at 314. The court based its conclusion on the fact that even if petitioner's contention regarding the lack of an explicit discussion as to his rights was true, the "overwhelming factual basis for the plea" —the likelihood of conviction based on petitioner's own admissions—is what induced the plea. *See id.* The court stated that "[n]o amount of discussion of the value of those rights would have affected his decision at the time it was made." *See id.*

As to the claim that the petitioner was not advised of all of the elements of second degree murder, the court credited defense counsel's state court testimony that petitioner was indeed so advised. *See id.* The court further stated that, even if it assumed that petitioner was not specifically informed of the requisite element of intent, the petitioner did not demonstrate how his plea decision would have been altered. *See id.* at 315. In this way, the court, without denominating it as such, performed the analysis called for under the second part of the *Strickland* test.

Of course, the case before me does not involve precisely the kinds of advisory, investigatory or courtroom failings in case preparation, presentation or option selection that are conventionally complained of

in ineffectiveness of counsel cases. As I have already observed, the Supreme Court in *Hill* expressly declined to discuss the application of the *Strickland* prejudice standard to cases where the complaint is not case related error, but sentence content related error.

Nonetheless, the following general principles are clear as I address the instant petition. Stability and finality in convictions by plea are immensely important to the nation's criminal justice system. *Hill*, 474 U.S. at 56, 106 S.Ct. at 369; *United States v. Timmreck*, 441 U.S. 780, 784, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979). In making the inquiry on prejudice, what is necessary is not slavish application of mechanical formulas, but a determination of whether the proceeding which result is being challenged was fundamentally fair. *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069.

The central conflict in the evidence of record is in the testimony of petitioner and his attorney Anthony Sparacio on the following points: (1) whether Mr. Sparacio told petitioner, prior to the entry of the guilty plea, that petitioner would be released from prison in five years, in spite of the assertion by the judge that he would have to serve a minimum of fifteen years; (2) whether Mr. Sparacio told petitioner that the work release was a secret arrangement, to which the judge was a party, which had to be concealed from press, public and the official court record, to which end the remarks of the judge concerning the duration of petitioner's minimum term were intentionally misleading; (3) whether Mr. Sparacio told petitioner that Prout, after agreeing to pled guilty, could not testify as a witness for petitioner; (4) whether Mr. Sparacio told petitioner that his family did not, during the pendency of the plea offer, support his determination to stand trial; (5) whether Mr. Sparacio told petitioner it was not possible to vacate his guilty plea; and (6) whether Mr. Sparacio threatened petitioner with the loss of early work release if petitioner made known to the court his (Sparacio's) conduct which had, according to petitioner, induced the plea.

Petitioner is an intelligent, resourceful and verbally sophisticated individual. A comprehensive review of his written and, especially, oral testimony reveals a mind quite facile in responding to the necessities of his case. He has, however, fatally impeached his own credibility with his assertion that he was told by his attorney that the plea and sentence proceedings were, in substance, a sham, to which Justice Dubin was a party, devised to deceive the press, the public and the Court system and guarantee his freedom in five years. The first observation about such an astonishing charge against his lawyer is why did it take petitioner nine years to formulate it in these terms? A more trenchant objection lies in the utter absence of any hint of such an odd conspiracy in the voluminous statements over many years of Willie Prout, Father Mitchell, Robert Sparrow, petitioner's mother, and other relatives. Is the theory that Mr. Sparacio merely wished to be rid of the case? Such a claim is thoroughly at odds with the record of energetic and sympathetic service of counsel to his client in this case. Even if petitioner is predicating the claim upon an argument that his lawyer was not malevolent, but only incompetent, and wrongly intuited a devious or pragmatic design and character to the formal proceedings, such is wholly inconsistent with the honorable, intelligent, and forthright attitude that has characterized Mr. Sparacio's behavior and performance in the matter. Perhaps the argument is that in his zeal and conviction of superior understanding, Mr. Sparacio sought to save petitioner from his own folly and quite casually resorted to the crudest of lies to achieve the desired goal. The plain answer to this is that the only proof of it is in this very late, self-serving, utter blackening of his lawyer's reputation by petitioner.

Petitioner insists that he was furious with Mr. Sparacio in the immediate aftermath of taking the plea because the latter had induced the plea through falsehood. We are told that petitioner concluded that his counsel was nothing less than a treacherous scoundrel who had betrayed petitioner's family and petitioner's right to go to

trial. And yet, during the two full months that elapsed between the plea and sentence, no attempt was made to withdraw the plea and discharge his attorney. More telling, petitioner's own witness, the prison chaplain Father Mitchell, who saw petitioner numerous times during this period, testified that he heard no such distress about Mr. Sparacio out of the mouth of petitioner. With respect to petitioner's claim that his mother supported his determination to stand trial and reject the plea, and had been lied to by his counsel, Father Mitchell testified that he was personally present at a meeting on the Saturday prior to the entry of the plea, when urgings to *take* the plea and *not* stand trial were in fact coming from petitioner's mother.

Regarding the claim that his counsel improperly told petitioner that Prout, after pleading guilty, could not testify as a witness for petitioner, the record is clear that petitioner was told that in practical effect Prout could not help petitioner, since a) his own plea allocution would implicate petitioner and b) Mr. Sparrow had already told Mr. Sparacio that Prout would not help petitioner if he, Prout, testified at a trial of petitioner.

Finally, the claims that Mr. Sparacio told petitioner that he could not move to withdraw his guilty plea, and had threatened him with loss of the early release if petitioner exposed counsel's conduct in open court, are wholly without corroboration of any kind, and must fail if petitioner is found to be generally and broadly lacking in credibility.

The testimony of Anthony Sparacio is characterized by candor, discretion, objectivity and reliability. He devoted himself unsparingly to preparing his client's case, and took great pains, in the face of what can only be described as savage attacks upon his integrity and predictable arguments going to his own lack of credibility, to limit his evidence in early affidavits because of concern over anything that "could hurt Peter." MT 373. His analysis of the

case against petitioner was searching, penetrating and professionally sound. Most importantly, his position that he never asserted that petitioner had a guaranteed release in five years is corroborated, though not unequivocally, by petitioner's principal witness, Father Mitchell, who reported on the telephone conversation he had with Mr. Sparacio, in which he was told that petitioner "would be *eligible* for it *after* a period of time", and that there was "*nothing guaranteed.*" MT 44 (emphasis added).

In ultimate effect, then, I reject in whole the testimony of petitioner as lacking in creditworthiness. I accept the testimony of Anthony Sparacio as wholly convincing. I find as ultimate facts that counsel did not tell petitioner: that he would be released from prison in five years; that the co-defendant Prout could not as a matter of law testify in petitioner's defense; that petitioner's family did not support his decision to stand trial; that it was not possible for the court to vacate his guilty plea; and that if petitioner made known to the court counsel's conduct which had induced the plea, he would lose his early release on work release. Furthermore, I find that petitioner's tale of a secret arrangement that would cause his deliverance from prison in five years, "an undercover thing", as he put it, Tr 11, is nothing more than a crude *deus ex machina* [8] to explain his silence in the face of explicit statements made in open court that he would not be released in five years.

The Court further finds, based upon Mr. Sparacio's forthright admission, that petitioner was erroneously advised by his counsel that he would be *eligible* for the work release program, at some point between the fifth and fourteenth year of his sentence. I further find that petitioner was also advised that in any event work release is absolutely and solely a discretionary authority exclusively in the control of the Correction Department. Accordingly, the only issue for review under the first element of the *Strickland* analysis is whether

---

**8.** A Roman term derived from the Greeks, originally applied to a device of classical dramatists that appears or is introduced suddenly and un-expectedly and provides an artificial or contrived solution to an apparently insolvable difficulty.

this error made counsel's overall performance fall below an objective standard of reasonableness. I decline to enter a formal finding on this ground under the explicit invitation of *Strickland,* since I believe that petitioner has failed to adequately demonstrate prejudice under the second element therein.

I find that the District Attorney's case against the defendant, specifically on the charge of murder in the second degree predicated upon a theory of depraved indifference to human life, was overwhelming, that petitioner was told this in comprehensive and convincing detail, that he understood it, and that he knowingly, intelligently and voluntarily waived his right to stand trial and exercised his right to plead guilty because he concluded he would be convicted and sentenced to a minimum of 25 years in prison if he did not accept the plea offer.

The Court finds that there were two decisive events in the deterioration of his defense, such as it was, to the charges that caused him to decide against standing trial. One was the plea in open court of Linda Krauss on the first day of jury selection, which portended very damaging testimony that he was much more deeply implicated in the crime than he had let on to police. Indeed, she stated that she was the person who acted as the lookout, destroying petitioner's claim to that arguably more benign role, and that he actually carried the fire extinguisher and knew that it contained gasoline. Petitioner also understood that she would testify that the fire was started with a match.

The second decisive event leading to the petitioner's plea was the decision of Willie Prout, a few days later, to plead guilty, thereby eliminating any chance that Prout could contradict Krauss' account of petitioner's role in the crime, since the District Attorney would not allow Prout's allocution to contradict Krauss' with petitioner still to be tried. It will be recalled that Prout made a statement to Detective William Rochford in which he stated that he (Prout) and petitioner bought the gasoline together and then told Linda Krauss what they intended to do with it. This state-

ment, which could not be used if Prout did not testify, clearly demonstrates that petitioner knew that the fire extinguisher contained gasoline and of Prout's intention to spray the token booth with it. It has added significance because in petitioner's three statements to the police he never admitted knowing that the canister contained gasoline. Prout's decision to plead guilty extinguished any hope petitioner had that he (Prout) would repudiate his prior statement to the police describing petitioner's role and knowledge, and affirmatively contradict Linda Krauss' damning account of the incident. And of course, it left the clear possibility that he would be a witness for the prosecution against petitioner and testify consistently with his previous statement. Indeed, it is significant that petitioner's final decision to plead guilty came just minutes after he learned Prout had decided to plead guilty.

I further find, based upon the uncontroverted testimony of the wholly neutral witness Robert Sparrow, that in conversations in which he participated with both defendants after the plea offer was made, it was explicitly and decisively the strength of the prosecution's case on the depraved indifference charge and the consequent inevitability of a 25 year minimum sentence that led both petitioner and Prout to plead guilty. This evidence decisively supports the testimony of Mr. Sparacio and contradicts the testimony of petitioner on the question of what caused petitioner to enter his plea of guilty. It is consistent with the testimony of Father Mitchell that when he left petitioner less than two days prior to petitioner's entry of the plea, petitioner was not interested in the work release program and was focusing on his chances of winning at trial. I find that petitioner pleaded guilty because he concluded he could not win at trial. *See, e.g., Renzi v. Warden, U.S. Penitentiary,* 792 F.2d 311, 314 (2d Cir. 1986) (petitioner pleaded guilty "after being sensibly counseled by his attorney and after weighing the risks of going to trial against pleading guilty....").

I also observe that at the hearings before both the Magistrate and myself, petitioner strongly implied that it was the "label" of murderer that gave him difficulty with the

plea. His testimony before me leaves a justifiable inference that he expected to be convicted of a lesser crime or crimes for his role in the incident:

> THE COURT: Would it be fair to say that you were concerned with the label of murderer? Is that the substance of your concern in the way that you have expressed it now?
>
> THE WITNESS: Label—yes, the label was well as to say, yes, I am a murderer. I will have to proclaim it, and I had a problem with that. I would avoid that at all costs, which I felt I did until—
>
> THE COURT: All right.
>
> THE WITNESS: I thought I could somehow—something would happen at trial.
>
> THE COURT: It was a long shot, though, wouldn't you agree?
>
> THE WITNESS: Now?
>
> THE COURT: Your lawyer explained to you the details, the strengths of the prosecutor's case, the fact that there was some forensic evidence, there were statements and so forth; it was a strong case, wasn't it?
>
> THE WITNESS: Well, it was a strong case for a crime, your Honor. There was a crime committed, not to this day, I will not challenge, a serious crime.
>
> THE COURT: All right.
>
> THE WITNESS: But I don't believe it was murder, and I think that the proof could have been looked at like that, but I think it could also have been turned, flipped over to show what I believe to be the truth.

Tr 60.

As he was charged with six counts of murder, three counts of felonious assault, two counts of arson and one count of reckless endangerment, it is plain that even if, in the face of the overwhelming evidence to the contrary, he had gone to trial and the jury convicted him only of manslaughter on the homicide counts [9], he nonetheless faced potential minimum sentences in the aggregate which would exceed the fifteen years

he received in his plea bargain, since, as our circuit court stated in an analogous ineffectiveness of counsel habeas case, that we ought not assume that he would receive concurrent sentences for convictions on the non-murder counts. *See Ames v. New York State Division of Parole*, 772 F.2d at 16 (discussed *supra* at 1425). Accordingly, even on this hypothesis, petitioner has not satisfied the *Strickland* analysis as he has not shown that his case would have been disposed of on a more favorable basis. *See id.*

### III. CONCLUSION

In light of all the foregoing, this court concludes, as an ultimate fact, that the erroneous information given by counsel to petitioner on when petitioner would be eligible for work release notwithstanding, there has been no reasonable probability shown, that but for counsel's error, petitioner would have insisted on going to trial.

Accordingly, the Writ is denied and the petition is dismissed.

SO ORDERED.

---

9. Even in the unlikely event that petitioner would not have been convicted of depraved indifference murder, it was extremely likely that a jury would have found that there was sufficient evidence to convict him on the felony murder counts as the fire was deliberately started, an accelerant was used, petitioner and Prout had a motive, Krauss was to testify that a match was used, and the fire was the direct cause of the deaths of the two token booth clerks.